1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940

2

Walnut Creek, CA 94596
Telephone: (925) 300-4455

3

Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com

4

5

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)

6

New York, NY 10019
Telephone: (646) 837-7150

7

Facsimile:  (212) 989-9163
E-Mail: jmarchese@bursor.com

8

        aleslie@bursor.com

9

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice* forthcoming)

10

630 Fifth Avenue, Suite 2000
New York, NY 10111

11

Telephone: (212) 884-4230
Facsimile:  (212) 884-4230

12

E-Mail: adrian@gr-firm.com

13

*Attorneys for Plaintiff and the Putative Class*

14

15

## UNITED STATES DISTRICT COURT

16

## NORTHERN DISTRICT OF CALIFORNIA

17

18

| | |
|---|---|
| LUCAS YOUNG, individually and on behalf of all other persons similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FLOSPORTS, INC., | |
| Defendant. | |

19

Plaintiff,

20

v.

21

FLOSPORTS, INC.,

22

Defendant.

23

24

25

26

27

28

Plaintiff Lucas Young ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant FloSports, Inc. ("FloSports" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and their counsel, which are based on personal knowledge.

## INTRODUCTION

1.      This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription sports broadcasting and streaming services across its network sites (collectively, the "FS Subscriptions," enumerated below) through its website, https://www.flosports.tv/ (the "FloSports Website"). Defendant is a Texas-based subscription sports broadcaster and streaming service that, among other activities, streams live sporting events to audiences around the world. Relevant to Plaintiff's allegations, when customers sign up for an FS Subscription in order to gain access to a live stream through the FloSports Website, Defendant enrolls customers in a program that automatically renews customers' FS Subscription on a yearly basis and results in yearly charges to customer's credit card, debit card, or third-party payment account (collectively, "Payment Method"). In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to and obtained from California consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq.*

2.      Through the FloSports Website, Defendant markets, advertises, and sells to consumers in California and throughout the United States paid memberships to the FS Subscriptions, which include broadcasting and streaming services for numerous sports channels[1] (collectively, the "FS Subscriptions"). To sign up for one of Defendant's FS Subscriptions through the FloSports Website, customers must provide Defendant with their billing information and Defendant then automatically charges customers' Payment Method as payments are due, typically

---

[1] The sport channels include: FloBikes, FloBowling, FloCheer, FloComba, FloDance, FloElite, FloFC, FloFootball, FloGrappling, FloGymnastics, FloHockey, FloHoops, FloLive, FloMarching, FloRacing, FloRodeo, FloRugby, FloSoftball, FloSwimming, FloTrack, FloVoice, FloVolleyball, FloWrestling, and Varsity.

on a yearly basis. Defendant is able to unilaterally charge its customers' renewal fees without their consent, as Defendant is in possession of its customers' billing information. Thus, Defendant has made the deliberate decision to charge Plaintiffs and other similarly situated customers on a yearly basis, absent their consent under the ARL, absent the requisite disclosures under the ARL, and in reliance on consumer confusion and inertia to retain customers, combat consumer churn, and bolster its revenues.

3. Pursuant to the ARL, online retailers who offer automatically renewing subscriptions to California consumers must: (a) obtain affirmative consent prior to the consumer's purchase; (b) provide the complete auto-renewal terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to the purchase; and (c) provide an acknowledgement identifying an easy and efficient mechanism for consumers to cancel their subscriptions. As will be discussed below, the enrollment process for the FloSports Subscriptions through the FloSports Website uniformly violates each of the core requirements of the ARL.

4. Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Method without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Sections 17602(a)(3) and 17602(b). Cal. Bus. & Prof. Code §§ 17602(a)(l), (a)(2), (a)(3), (b). As a result, the access to the sports broadcasting, or streaming services granted to Plaintiff and the Class under the automatic renewal of continuous service agreements are deemed to be "unconditional gifts" under the ARL. Cal. Bus. & Prof. Code § 17603.

5. For the foregoing reasons, Plaintiff brings this action individually and on behalf of all California purchasers of any of Defendant's FS Subscriptions offerings who, within the

applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for the renewal of their FS Subscriptions. Based on Defendant's unlawful conduct, Plaintiff seeks damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (ii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (iii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; and (iv) unjust enrichment/restitution.

## THE PARTIES

6.      Plaintiff Lucas Young is a citizen of California, residing in Sonoma, California. On or around August 14, 2021, Mr. Young purchased a yearly FS Subscription ("FloGrappling") from Defendant's Website while in California. During the enrollment process, but before finally consenting to Defendant's subscription offering, Mr. Young provided his Payment Method information directly to Defendant. At the time that Mr. Young enrolled in his FS Subscription program, Defendant did not disclose to Mr. Young all of the required automatic renewal offer terms associated with the subscription program or obtain Mr. Young's affirmative consent to those terms. Further, after Mr. Young completed his initial order, Defendant sent Mr. Young an email confirmation and receipt for his purchase of and enrollment in the FS Subscription (the "Acknowledgment Email"). However, the Acknowledgment Email, too, failed to provide Mr. Young with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Mr. Young's FS Subscription in a manner capable of being retained by him. Mr. Young did not receive any other acknowledgement that contained the required information. As a result, Mr. Young was not placed on notice of several material terms associated with his FS Subscription. In particular, Mr. Young was not made aware of the recurring price to be charged upon renewal, the length of the renewal term, when the first charge would occur, or the complete cancellation policy associated with his FS Subscription: the most crucial aspects of which were missing from the Checkout Page and

Acknowledgment Email. In any case, shortly after Mr. Young first signed up for his FS Subscription, Mr. Young learned upon reviewing his billing statements and banking history that, notwithstanding the confusing terms of his FS Subscription, Defendant enrolled Mr. Young into its year-long automatic-renewal subscription and, without Mr. Young's affirmative consent, charged Mr. Young's Payment Method for a full annual rate of $149.99 associated with his FS Subscription—resulting from Defendant's inadequate ARL disclosures and its deceptive Checkout Page design which prominently displayed on the center of the webpage that the purchase price was $12.50. After this discovery, Mr. Young emailed Defendant through the FloSports Website in order to avoid incurring any future charges in connection with FS Subscription. Further, Mr. Young notified Defendant that he did not authorize – and to request a refund of – the unauthorized charge to his Payment Method. However, Defendant denied Mr. Young's refund request and, on August 20, 2022, attempted to auto-renew Mr. Young's FS Subscription for yet another year by charging his Payment Method. Defendant's misleading, missing and incomplete disclosures on the Checkout Pages and in the Acknowledgment Emails, its failure to obtain Mr. Young's affirmative consent before charging his Payment Method on a yearly basis, and its subsequent refusal to issue a refund of those unauthorized charges, are contrary to the ARL, which deems products provided in violation of the statute to be a gift to consumers. *See* Cal. Bus. & Prof. Code § 17603. Had Defendant complied with the ARL, Mr. Young would have been able to read and review the auto renewal terms prior to purchase, and he would not have subscribed to FS Subscription at all or on the same terms, or he would have canceled his FS Subscription earlier, *i.e.*, prior to the expiration of the initial subscription. As a direct result of Defendant's violations of the ARL, Mr. Young suffered an economic injury.

7.     Defendant FloSports, Inc. ("FloSports" or "Defendant") is a Delaware corporation with its principal place of business at 979 Springdale Rd, Ste 120, Austin, Texas, 78702. Defendant is one of the largest subscription sports broadcaster and streaming service providers for niche sports such as mixed martial arts, gymnastics, and racing competitions. The growth of FloSports has been unprecedented. Currently, "FloSports boasts five million monthly unique viewers across

its platforms, which offer live or on-demand coverage of over 200,000 competitions from more than 25 sports around the world, including basketball, cycling, rugby, ice hockey and gymnastics."[2] Relevant here, Defendant offers access to certain exclusive FloSports content, products, and/or services on a contract or fee basis to customers who enroll in the automatically renewing FS Subscriptions. Defendant wholly owns and operates the FS Subscriptions, which it markets to consumers through the FloSports Website. Defendant is responsible for the promotion, advertisement, and/or marketing of the FS Subscriptions, and it owns and operates the FloSports Website. Defendant sells – and, at all times during the applicable Class Periods, sold – the FS Subscriptions in California and has done business throughout the United States. In connection with the FS Subscriptions, Defendant made automatic renewal offers to consumers in California and throughout the United States via the FS Website at all relevant times during the applicable Class Periods.

8.      Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from Defendant.

10.      This Court has personal jurisdiction over the parties because Plaintiff resides in California and submits to the jurisdiction of the Court, and because Defendant has, at all times relevant hereto, systematically and continually conducted business in California, including within

---

[2] SportsPro, "*We not only survived, we started to thrive": Catching up with FloSports CEO Mark Floreani* (November 16, 2021). https://www.sportspromedia.com/insights/flosports-ceo-mark-floreani-sportel-monaco-hockeytech-college-sports-ncaa.

this District, and/or intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its products and/or services to residents within this District and throughout California. Additionally, Plaintiff purchased his FS Subscription from Defendant while in California.

11.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Also, Plaintiff resides in this District and purchased Defendant's FS Subscription in this District. Moreover, Defendant systematically conducts business in this District and throughout the State of California, and it distributed, advertised, and sold the FS Subscriptions to Plaintiffs and Class Members in this State and District.

## FACTUAL ALLEGATIONS

### A.     Background On The Subscription e-Commerce Market

12.     The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[3] Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests. Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years. Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[4] Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[5] That constitutes an average annual

---

[3] *See* https://www.coredna.com/blogs/ecommerce-subscription-services.

[4] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (January 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[5] *See* UBS, *Investing in digital subscriptions* (March 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%."). *See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (April 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (October 7,

---

growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally.[6]

13.      As noted above, the production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years. According to Forbes, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[7]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[8]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[9]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[10]

14.      The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover. During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[11]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown

2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but are-you-reaping-the-full-benefits-02434851.

[6] UBS, Investing in digital subscriptions (Mar. 10, 2021), supra ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); see also Juniper Research, Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

[7] The State Of The Subscription Economy, 2018, Forbes (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[8] See UBS, Investing in digital subscriptions (Mar. 10, 2021), available at https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[9] *Id.*

[10] *Id.*

[11] UBS, Investing in digital subscriptions (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our- approach/marketnews/article.1525238.html.

mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[12]

15.     However, as *The Washington Post* has noted, there are downsides associated with the subscription-based business model. While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[13]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[14]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[15]  As these companies have realized, "[t]he real money is in the inertia."[16] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[17]  That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by intentionally

---

[12] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[13] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers*, (February 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking- inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[14] *Id.*

[15] Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (April 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[16] *Id.*

[17] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (June 25, 2019), https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.

confusing users with their app's design and flow, … and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[18]

16.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[19] Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[20] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts [and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[21] widespread utilization of these misleading dark patterns and deliberate omissions persist.

17.     Defendant has successfully implemented this tactic. According to Bloomberg, as of date, FloSports has more than 500,000 subscribers.[22]  In 2021 alone, "FloSports saw its subscriber base grow by more than 50% year-over-year[] and saw 100% growth in traffic on its platform. Revenue grew by more than 50%."[23] Defendant's rapid growth of its audience base is directly linked to its aggressive, and deceptive, marketing tactics. For example, to promote its 2021 Tour De France cycling broadcast, "FloSports grew its YoY programmatic advertising revenue by 96%

---

[18] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (October 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[19] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[20] *Id.*

[21] *Id.*

[22] Bloomberg, *Niche Sports Streaming Service Expands While Giants Retrench* (December 8, 2020), https://www.bloomberg.com/news/articles/2020-12-08/niche-sports-streaming-service-expands-while-giants-retrench#xj4y7vzkg.

[23] Austin Business Journal, *FloSports' growth trajectory means new headquarters, more sports being streamed, tons of hiring* (February 28, 2022), https://www.bizjournals.com/austin/news/2022/02/28/flosports-new-hq-streaming-sports.html.

across social media platforms including Facebook and YouTube… lead[ing] to a 588% increase in video views, a 100% increase in engagement rates, and 465% increase in the number of engagements."[24]

**B.      Defendant's Dark Patterns And Online Consumer Complaints About The FS Subscriptions**

18.      Defendant's recent growth in revenues and subscriber count with respect to its FS Subscriptions coincides with a sharp decline in subscriber satisfaction as the FloSports Website and accompanying marketing have become riddled with "dark patterns." Dark patterns "are tricks used in websites and apps that make you do things that you didn't mean to, like buying or signing up for something."[25]  Consumers have complained on social media outlets both about Defendant's misleading enrollment process as well as its unclear cancellation process. On a Reddit thread, with hundreds of other users voicing the same frustrations, a consumer complained "Flograppling misleading people, Says you only be charged one time fee for watching an event then they charge for a whole year's membership, they know exactly what they are doing and have over 800 complaints of this same issue on Better Business Bureau."[26]  Indeed, as Truth in Advertising[27]  has pointed out, Defendant uses "bait-and-switch" dark patterns by "offer[ing] subscriptions to live video coverage of dozens of underexposed sports and competitive activities, ranging from wrestling and rodeos to singing and dancing, with plans starting at $12.50 a month according to its website. But what FloSports doesn't make clear on the signup pages for these subscriptions (linked above) is that this low monthly rate is contingent on signing up for an annual plan, which costs

---

[24] Sports Video Group, *After Partnership With Grabyo, FloSports Sees 96% Year-Over-Year Increase in Social Ad Revenue During 2021 Tour De France* (August 24, 2021), https://www.sportsvideo.org/2021/08/24/after-partnership-with-grabyo-flosports-sees-96-year-over-year-increase-in-social-ad-revenue-during-2021-tour-de-france/

[25] https://www.deceptive.design/

[26] https://www.reddit.com/r/bjj/comments/s9sdmk/flograppling_misleading_people_says_you_only_be/

[27] Truth in Advertising is a nonprofit organization devoted to consumer protection that regularly publishes articles about deceptive marketing and sends complaint letters to the Federal Trade Commission ("FTC") for regulatory action.

$150 a year."[28]  Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the actual price and terms of its automatic-renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their FS Subscriptions. It has further led to an increase in accidental or unintentional sign-ups by consumers for paid FS Subscriptions plans, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.

19.    In fact, Defendant's conduct has drawn the attention and ire of customers across the country, with countless angry customers taking to the Internet to voice their discontent over Defendant's broken promises. For instance, numerous subscribers have left scathing reviews on the Better Business Bureau website, on a near daily basis, complaining of the unclear billing practices and confusing cancellation policy associated with Defendant's FS Subscriptions:[29]

///

///

///

///

///

///

///

///

///

///

///

///

///

---

[28] Truth in Advertising, *Streaming service advertises a monthly rate for a wrestling package that has no monthly plan* (February 13, 2019), https://truthinadvertising.org/articles/flosports-flowrestling/

[29] *See* https://www.bbb.org/us/tx/austin/profile/digital-media/flosports-inc-0825-1000108975/complaints

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**Monte S**

 ★☆☆☆☆                                                                08/13/2022

Just like the rest of the reviews, I signed up for the monthly and was charged for a year and not able to cancel my subscription. In addition the streaming is weak at best. Several time during the races it will stop and spool so you see about 3/4 of the event.



**David J**

 ★☆☆☆☆                                                                08/13/2022

I signed up to watch One race and got billed for a full year. Tried to contact someone at flow racing no luck they don't take calls they don't return calls I want most of my money back how do I get it?



**Tyler P**

 ★☆☆☆☆                                                                08/07/2022

Misleading check-out screen...scammed like everyone else. I have never seen another website have a check-out screen designed like theirs, it has to be a deliberate money grab and they should be held accountable.



**Randy B**

 ★☆☆☆☆                                                                07/29/2022

DO NOT get a subscription through Flosports. When you want to cancel they charge you a ridiculous amount of $$$



**Gabe P**

 ★☆☆☆☆                                                                07/28/2022

Total scam! Charged $160 for a year subscription when site shows $12.50 per month. After paying for Mavtv for 3 months racing has moved to this scam of a company with 3 races left in series, now stuck for a year! Now I'm being told I will be charged ***** for 1 month and reimbursed the balance. Something should be done about this fraud. Not to mention Saturday race was cutting out and freezing. ZERO STARS

20.     Other subscribers to FS Subscriptions left similar complains on Amazon.com: [30]

**From the United States**

S. Watson

★★★☆☆  **Not a monthly fee but YEARLY**
Reviewed in the United States on May 1, 2022
Verified Purchase

Subscribed to this streaming service so my elderly boyfriend could hopefully sit at home and enjoy our local short track race. Streaming was good, but the website is very misleading. Site states that is $12.50 per month, but once you subscribe, you are charged for a whole year plus tax. Granted this is still cheaper than going to the track, but very misleading. I was charged $165.00 when the website states you pay only $150.00. BUYER BEWARE!

One person found this helpful

Helpful     Report abuse

CKWiggins

★★★☆☆  **Definitely not monthly charge as stated!**
Reviewed in the United States on March 15, 2022
Verified Purchase

Quality is ok. Only certain games can be viewed. I guess I thought they streamed everything I wanted! Lol!
You are charged for the year! No option to choose monthly making it more difficult because you have to contact them to get it changed.

Helpful     Report abuse

TMD

★★☆☆☆  **Too expensive and streaming quality is not great!**
Reviewed in the United States on December 31, 2021
Verified Purchase

I have used this service 3x already and the streaming quality is lackluster. Lots of spinning and buffering. It's also too expensive for a monthly subscription to watch a few sports games.

Helpful     Report abuse

Tri Mike

★★☆☆☆  **Lack of non-full-year subscription option is very disappointing. Did not order.**
Reviewed in the United States on October 6, 2020
Verified Purchase

No option for monthly or partial-year subscription. $150 for the full year was nowhere near the value for money. Would be willing to pay a monthly multiple to get month-to-month pricing instead of having to pay for a full year. "Cancel anytime" seems to indicate you pay the full year and can cancel whenever you want but don't get a partial refund for unused time. Either clarify this or add a monthly pricing option.

16 people found this helpful

Helpful     Report abuse

D MOORE

★☆☆☆☆  **Rip off sports app**
Reviewed in the United States on July 14, 2022
Verified Purchase

Too pricey monthly fee with limited offerings

Helpful     Report abuse

Amazon Customer

★☆☆☆☆  **Misleading and poor performance!!**
Reviewed in the United States on February 9, 2022
Verified Purchase

Misleading and poor performance!! Leads you think you can subscribe monthly but this only happens after you are charged for a year. Then the live feed was inconsistent a d I missed my sons events. Wifi was strong and my 5G connection was strong and nether worked. No refund was available and I would not recommend, out athletic director tried getting resolutions and decided not to us this service in the future.

Helpful     Report abuse

---

[30] https://www.amazon.com/FloSports-Inc/product
reviews/B07Q3T4JWK?reviewerType=all_reviews

CLASS ACTION COMPLAINT –JURY TRIAL DEMANDED                                          13

21.     The above reviews are just a sampling of the widespread pattern of uniform unlawful conduct by Defendant, underscoring the artifice devised and employed by Defendant to lure and deceive millions of consumers into enrolling, and remaining enrolled, in its paid FS Subscription programs.

**C.     California's Automatic Renewal Law**

22.     In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq.*, with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." Cal. Bus. & Prof. Code § 17600 (statement of legislative intent). More recently, in 2018, California's Senate Bill 313 amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online.

23.     The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1)     Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer. If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.
>
> (2)     Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

(3)   Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer. If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

24.    Section 17602(b) of the ARL further provides:

A business that makes an automatic renewal offer or continuous service offer shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(b).

25.    Additionally, following the 2018 amendment to the ARL, the updated law requires e-commerce sellers, doing business in California, to allow online cancellation of auto-renewing memberships or recurring purchases that were initiated online. Specifically, Section 17602(c) provides:

[A] consumer who accepts an automatic renewal or continuous service offer online shall be allowed to terminate the automatic renewal or continuous service *exclusively online*, which may include a termination email formatted and provided by the business that a consumer can send to the business without additional information.

Cal. Bus. & Prof. Code § 17602(c) (emphasis added).

26.    The updated ARL also requires a seller who provides an automatic offer that includes a free gift, trial, or promotional pricing to notify consumers about how to cancel the auto-renewal before they are charged. Sellers must also explain the price to be charged when the promotion or free trial ends. If the initial offer is at a promotional price that is only for a limited time and will increase later, the seller must obtain consumer consent to the non-discounted price prior to billing. *Id.* Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan

or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." Cal. Bus. & Prof. Code § 17601(a).

27.     Section 17601(b) of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels. (2) The description of the cancellation policy that applies to the offer. (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known. (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer. (5) The minimum purchase obligation, if any." Cal. Bus. & Prof. Code § 17601(b).

28.     Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c).

29.     Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business[.]" Cal. Bus. & Prof. Code § 17603.

30.     As alleged below, Defendant's practices on the FloSports Website systematically violate Sections 17602(a)(l), 17602(a)(2), and 17602(a)(3) of the ARL.

**D.     Defendant's Business: The Subscription Enrollment Process**

31.     At all relevant times, Defendant offered, via the FloSports Website, the FS Subscriptions, which gives consumers access to its video streaming services. These paid

subscriptions are offered on a recurring basis for monthly and/or yearly renewal terms, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels. For example, customers that sign up for a monthly FS Subscription are, at the end of the initial one-month period, automatically renewed and typically charged the full amount for the next month, and every month thereafter if they do not cancel. Similarly, customers enrolled in an annual FS Subscription are, at the end of the initial one-year period, automatically renewed and typically charged the full amount for the next year, and every year thereafter if they do not cancel. Defendant's FS Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of Cal. Bus. & Prof. Code § 17601.

32.     To sign up for one of Defendant's FS Subscriptions, the consumer must first select a program. From the FloSports Website, prospective subscribers can review features of – and find links to the individual enrollment webpages for – each of Defendant's subscription offerings, including the FS Subscriptions at issue.

33.     Consumers can sign up for one of Defendant's subscription plans through the FloSports Website, on either its mobile or desktop format. Defendant automatically enrolls customers who purchase a paid FS Subscription via the FS Website in their chosen FS Subscription program going forward, by default.

34.     The enrollment process for each FS Subscription is substantially the same, regardless of the medium used. After selecting a subscription option, consumers are directed to subsequent webpages on the FloSports Website, where they are prompted to create a membership account and input their billing information. After these steps, consumers are directed to another, final webpage (the "Checkout Page"), where prospective subscribers are invited to complete their purchases. For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears "in visual proximity to the request for consent to the offer[,]" which in this case pertains to the latter block of text located immediately above the final red "Start Watching" button that customers must press in order to complete the checkout process.

35.     By way of example, at least as of August 2022, when a consumer signed up for a FS Subscription via his or her computer web browser, the "relevant portion of the Checkout Page" refers to the disclosures in the block of text above the red "Start Watching" button (i.e., the "request for consent"), which contains the following language and appearance (red box added for emphasis):



36.     Regardless of how the consumer subscribes (via the FloSports Website on its mobile or desktop format), and irrespective of which particular FS Subscription plan the consumer selects, Defendant fails to disclose the full terms of its auto-renewal program either before or after checkout, and it never requires the individual to read or affirmatively agree to any terms of service, i.e., by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for Defendant's FS

Subscriptions. Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – its subscribers before charging consumers' Payment Methods on a recurring basis.

### E. Defendant Violates California's Automatic Renewal Law

37.     At all relevant times, Defendant failed to comply with the ARL in three ways: (i) Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (ii) Defendant charged Plaintiff's and the proposed class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).

### i. Defendant Fails To Clearly And Conspicuously Present The FS Subscription Automatic Renewal Terms

38.     As explained in greater detail below, the relevant portion of Defendant's Checkout Page does not clearly and conspicuously present the complete "automatic renewal offer terms[,]" as defined by Cal. Bus. & Prof. Code §17601(b). First, Defendant fails to clearly and conspicuously disclose that "the subscription or purchasing agreement will continue until the consumer cancels" as defined by Cal. Bus. & Prof. Code § 17601(b)(1). As illustrated by the Checkout Page above, although the relevant portion mentions that "Your annual subscription will automatically renew on [the year after the enrollment date] and each year thereafter until you cancel" this disclosure is inadequate because it fails to specify that the consumer is even enrolling in an "annual subscription" in the first place. Specifically, the preceding text to that sentence, states "By clicking Start Watching, you will be charged $149.99 today for the first year." That call to action does not clearly state that consumers are agreeing to an "annual subscription," rather, it states that they are agreeing to a single charge to be placed that day. Thus, any reference to the recurring basis of the

"annual subscription" is anomalous because it is not tied to what consumers are purportedly agreeing to—i.e., a single charge on the given day of purchase. Aside from being inconspicuous, as discussed in greater depth below, the Checkout Page thus fails to disclose "[t]hat the subscription or purchasing agreement will continue until the consumer cancels" in the manner required by the statute. Cal. Bus. & Prof. § 17601(b)(1). For the same reasons stated above, Defendant also fails to disclose the "length of the automatic renewal term or that the service is continuous" as defined by Cal. Bus. & Prof. Code § 17601(b)(4).

39.     Second, Defendant fails to disclose the "description of the cancellation policy that applies to the offer" as defined by Cal. Bus. & Prof. Code § 17601(b)(2). Specifically, although the Checkout Page states that the "subscription will automatically…until you cancel," it fails to indicate the cutoff date for doing so. Specifically, the cancellation policy on the Checkout Page does not disclose that a consumer's "subscription automatically renews unless auto-renew is ***turned off at least 24-hours before the end of the current period***."[31] Further, neither the Checkout Page nor the terms of service on the FloSports Website indicates the time zone that applies to the cutoff date—*e.g.*, Eastern, Central, or Pacific Time. Aside from being inconspicuous, as discussed in greater depth below, the Checkout Page fails to disclose the "description of the cancellation policy that applies to the offer" in the manner required by statute. Cal. Bus. & Prof. § 17601(b)(2).

40.     Finally, Defendant fails to disclose the "recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known" as defined by Cal. Bus. & Prof. Code § 17601(b)(3). Specifically, although the Checkout Page indicates that consumers' "subscription will automatically renew," and that they "will be charged $149.99 today for the first year," Defendant does not indicate how much money consumers will be charged for ***each subsequent year***. To make matters worse, the Checkout Page also fails to disclose that "the amount billed each Monthly Period or Yearly Period ***may vary*** due to promotional offers, changes in your subscription, and

---

[31] https://www.flosports.tv/terms-of-service/ (last accessed August 25, 2022).

changes in applicable taxes."[32]  Aside from being inconspicuous, as discussed in greater depth below, the Checkout Page fails to disclose the "recurring charges that will be charged to the consumer's credit or debit card or payment …and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known" as defined by Cal. Bus. & Prof. Code § 17601(b)(3).

ii. **Defendant Fails To Clearly And Conspicuously Present The FS Subscription Terms Before The Subscription Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.**

41.     Because Defendant failed to present the full "automatic renewal offer terms" of its FS Subscriptions on its Checkout Page, as defined by Cal. Bus. & Prof. Code §17601(b), it, therefore, failed to present the material terms of its FS Subscriptions "before the subscription or purchasing agreement [was] fulfilled", in violation of Cal. Bus. & Prof. Code § 17602(1). Further, even if Defendant has presented the full "automatic renewal offer terms" of its FS Subscription (it did not), those terms were not presented "in a clear and conspicuous manner… and in visual proximity… to the request for consent to the offer" in violation of Cal. Bus. & Prof. Code § 17602(1).

42.     Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c). Defendant's inadequate "automatic renewal terms" fall well short of the mark from being conspicuous as defined under the ARL. Specifically, the terms are not "clear and conspicuous" because they are smaller than the text featured in and under the "Payment," and "Payment Info" headers above, which fill up at least 60% of the Checkout Page. Additionally, the terms, which appears in a gray 10-point font, without emphasis, and against a grey background are illegible to the naked eye without increasing the zoom level even on a large computer screen. At the same time, the illegible terms are much less obvious or noticeable than the text in the middle of

---

[32] https://www.flosports.tv/terms-of-service/ (last accessed August 26, 2022).

the Checkout Page which states, in a black 30-point bolded font, that the purchase price is "$12.49." This text is three times larger than the inadequate terms and also directly contradicts the $149.99 annual purchase price text in the terms. Finally, the terms are clearly overshadowed by the large call-to-action button which immediately turns red after a consumer finishes entering their payment information (drawing attention away from the faint grey text at issue). The "Start Watching" text within the call-to-action button also appears in a larger 12-point white font which is prominently contrasted against the red background of the button. It is clear from the design of Defendant's Checkout Page that Defendant intends to mislead prospective consumers, and has misled consumers, into purchasing its FS Subscriptions under false pretense. Based on the above, Defendant's deceptive Checkout Page does not "clearly call attention" to its otherwise inadequate "automatic renewal terms" in violation of Cal. Bus. & Prof. Code § 17602(1).

   iii.   **Defendant Fails To Obtain Consumers' Affirmative Consent To The Automatic Renewal Terms Associated With The FS Subscriptions.**

   43.   Furthermore, Defendant unlawfully charged Plaintiff's and the proposed class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal (and continuous service terms), including their promotional and discounted prices, in violation of Cal. Bus. & Prof. Code § 17602(2). Specifically, Defendant does not at any point during the checkout process require consumers to read or affirmatively agree to any terms of service associated with their FS Subscriptions, *e.g.*, by requiring consumers to select or click a "checkbox" next to the automatic renewal offer terms to complete the checkout process. In fact, as discussed above, the only terms that consumers could have purportedly agreed to, even without a checkbox manifesting affirmative consent, was that "[b]y clicking Start Watching, you will be charged $149.99 today for the first year." That call to action, however, does not otherwise state that by clicking the call-to-action button consumers were also agreeing to an "annual subscription." Thus, at no point, during the enrollment process or on the Checkout Page, was there an unambiguous or affirmative consent to Defendant's automatic-renewal terms in violation of Cal. Bus. & Prof. Code § 17602(2).

### iv.   Defendant Fails To Provide A Post-Checkout Acknowledgment That Clearly And Conspicuously Discloses The Required FS Subscription Offer Terms.

44.    Finally, after Plaintiff and the proposed class members subscribed to one of Defendant's FS Subscription plans, Defendant sent email follow-ups regarding their purchases (the "Acknowledgment Emails").

45.    By way of example, as of 2021, the subject line of the email stated: "Subscription Confirmation" The body of the email contained, in relevant part, the following text and images:



46.     The Acknowledgment Email contains even less of the required information than is featured on the relevant portion of the Checkout Page, discussed above. Namely, the purchase confirmation does not provide: that the subscription "will continue until the consumer cancels[,]" Cal. Bus. & Prof. Code § 17601(b)(1); a "description of the cancellation policy that applies to the offer[,]" Cal. Bus. & Prof. Code § 17601(b)(2); a statement of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, [and] if that is the case, and the amount to which the charge will change, Cal. Bus. & Prof. Code § 17601(b)(3); or "[t]he length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer[,]" Cal. Bus. & Prof. Code § 17601(b)(4).  As such, the Acknowledgment Email fails to "include[] the automatic renewal offer terms … and information regarding how to cancel in a manner that is capable of being retained by the consumer[,]" in violation Cal. Bus. & Prof. Code § 17602(a)(3).

47.     At all relevant times, Defendant has been well aware that its FS Subscriptions fail to comply with California's ARL as evidenced by the number of complaints lodged against it in the Better Business Bureau website. The facts giving rise to Plaintiff's claims are materially the same as the Class he seeks to represent.

48.     By and through these actions, Defendant has charged Plaintiff's and the proposed class members' Payment Methods in direct violation of the ARL. As a result, all goods, wares, merchandise, or products sent to Plaintiff and the Class under the automatic renewal of continuous service agreements are deemed to be "unconditional gifts" pursuant to Cal. Bus. & Prof. Code § 17603.

## **CLASS ACTION ALLEGATIONS**

49.     **Class Definition**: Plaintiff brings this action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All persons in California who, within the applicable statute of limitations period, up to and including the date of final judgment in

this action, incurred renewal fee(s) in connection with Defendant's FS Subscription offerings.

50.     Specifically excluded from the Class are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

51.     Plaintiff reserves the right to amend the definitions of this Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

52.     ***Numerosity***. Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, the Class comprises at least thousands of consumers throughout California. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

53.     ***Commonality and Predominance***. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Defendant's FS Subscriptions constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof. Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiff's and Class members' Payment Method for an automatic renewal service without first obtaining their affirmative consent to the automatic renewal offer terms in violation of Cal. Bus. & Prof. Code§ 17602(a)(2); (d) whether Defendant failed to provide an acknowledgement that included the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Class, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant

are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f) whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq., California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (g) whether Defendant's conduct alleged herein constitutes conversion and/or unjust enrichment; (h) whether Plaintiff and the Class are entitled to damages and/or restitution; (i) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and (j) whether Plaintiff and the Class are entitled to attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

54. **_Typicality._** The claims of Plaintiff are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the Class's affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the FS Subscriptions before charging their Payment Methods.

55. **_Adequacy._** Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer protection cases.

56. **_Superiority._** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, inter alia, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

57. Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

58.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and the Class and will likely retain the benefits of its wrongdoing.

59.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## COUNT I
### Violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*

60.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

61.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

62.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" Cal. Bus. & Prof. Code § 17200. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

63.     As alleged in more detail below, Defendant's acts and practices alleged herein are "unlawful" within the meaning of the UCL because they violated the following laws, regulations, and rules, including the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq.*, as well as the CLRA, FAL, and all other consumer protection statutes and common laws as asserted in Counts II through V below.

Violations of California's Automatic Renewal Law

64.     Additionally, at all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of its violations of the ARL, Cal. Bus. & Prof. Code §§ 17600, *et seq.*, as alleged in the above paragraphs of this complaint, which are incorporated herein by reference.

65.     Specifically, Defendant failed, and continues to fail, to: (a) provide the automatic renewal terms associated with its FS Subscription "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer[,]" in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Method, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3). Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their FS Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(b).

66.     Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

67.     All products received from Defendant in violation of the ARL, Cal. Bus. Prof. Code §§ 17602, *et seq*., constitute "unconditional gifts." *See* Cal. Bus. Prof. Code § 17603.

68.      As a direct and proximate result of Defendant's unlawful and/or unfair practices described herein, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiff and the Class in the form of payments made by Plaintiff and the Class for their FS Subscriptions. Defendant has profited from its unlawful and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon. Thus, Plaintiff have suffered injury in fact and lost money or property as a result of Defendant's violations of California's ARL.

69.     Defendant was prohibited from making these charges and taking Plaintiffs' money without the required affirmative consent. If Defendant had complied with the law, Defendant could not have made the charges, and would not have obtained this money from Plaintiff.

<u>Violations of Other Statutes and Common Laws</u>

70.     Furthermore, alleged below, Defendant has committed unlawful and/or unfair business practices under the UCL by: (a) representing that Defendant's goods and services have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); and (c) converting to Defendant's own use and benefit money that rightfully belongs to Plaintiff and the Class.

71.     Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

72.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

73.     Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

74.     Plaintiff and the members of the Class have suffered a substantial injury in fact and lost money by virtue of Defendant's acts of unfair competition, which caused them to purchase the FS Subscriptions. Had Defendant complied with its disclosure obligations under the ARL, Plaintiff and members of the Class would not have purchased their FS Subscriptions or would have canceled their FS Subscriptions prior to the renewal of the subscriptions, so as to not incur additional fees. Thus, Plaintiff and members of the Class were damaged and have suffered economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business practices

75.     Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful course of conduct. The public and the Class are subject to ongoing harm because the unlawful

and/or unfair business practices associated with the FS Subscriptions are still used by Defendant today.

76.    Plaintiff and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts that Defendant charged or caused to be charged to Plaintiff's and the Class's Payment Methods in connection with their FS Subscriptions during the four years preceding the filing of this Complaint. Defendant should be required to disgorge all the profits and gains it has reaped and restore such profits and gains to Plaintiff and the Class, from whom they were unlawfully taken.

77.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and members of the Class seek a court order enjoining Defendant from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant.

78.    Plaintiff, individually and on behalf of similarly situated California consumers, brings this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiff and the Class are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## COUNT II
### Conversion

79.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

80.    Plaintiffs brings this claim individually and on behalf of the members of the proposed Class against Defendant.

81.    As a result of charges made by Defendant to Plaintiff's and Class members' Payment Methods without authorization and in violation of California law, Defendant has taken money that belongs to Plaintiff and the Class.

82.    The amount of money wrongfully taken by Defendant is capable of identification.

83.    Defendant engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

84.    As a result of Defendant's actions, Plaintiff and the Class have suffered damages.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>COUNT III</u>**
**Violations of California's False Advertising Law ("FAL"),**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***

85.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

86.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

87.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, …in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

88.     Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading. Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

89.     Defendant's statements include but are not limited to representations and omissions made to consumers before and after enrollment in Defendant's FS Subscriptions regarding the terms of payment for and cancellation of a consumer's automatic payments. For instance, Defendant's representation on the Checkout Pages of the FloSports Website that members can "cancel" their FS Subscription is contradicted by their policy set forth elsewhere on the FloSports Website that customers must cancel their FS Subscriptions at least 24 hours before their the next

charge. In light of Defendant's disclosure of the former and silence as to the latter on the Checkout Pages for the FS Subscriptions, the representations and omissions on the Checkout Pages constitute false and deceptive advertisements. Similarly, Defendant misleads consumers into believing that they would only be paying a monthly charge, rather than a full yearly charge, by prominently displaying a monthly charge of $12.49 on the center of the Checkout Page and then burying within a barely legible block of text that the actual price of the FS Subscription is a $149.99.  Defendant also misleads consumers by displaying "ANNUAL" and "12.49" in extra-large, bold writing, while the monthly descriptor and annual total amount are set out in tiny, greyed-out font type.

90.     Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

91.     Defendant knew that its actions were misleading based on the sheer number of complains that it has received from consumers who were unwillingly enrolled into its FS Subscriptions under false pretenses.

92.     Plaintiffs and the members of the Class were deceived by Defendant's statements and omissions made online when they signed up and started paying for their FS Subscriptions, and other California consumers and members of the public were also or are likely to be deceived as well. Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions. Plaintiffs and other members of the Class did not learn of Defendant's FS Subscription price, cancellation, and automatic payment policies until after they had already signed up and started paying for Defendant's FS Subscription. Thus. they relied on Defendant's statements and omissions to their detriment.

93.     Plaintiffs and the Class lost money or property as a result of Defendant's FAL violations because they would not have purchased the FS Subscriptions on the same terms if the true facts were known about the product and the FS Subscriptions do not have the characteristics or the purchase price as promised by Defendant.

94.      Plaintiff, individually and on behalf of all similarly situated California consumers, seeks individual, representative, and public injunctive relief and any other necessary orders or

judgments that will prevent Defendant from continuing with its false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

## COUNT IV
### Violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*

95.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

96.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

97.     Plaintiff and the members of the Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

98.     Defendant's selection and/or subscription offers and the video, music, and other products pertaining thereto are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b). The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

99.     The acts and practices of Defendant as described above were intended to deceive Plaintiff and the Class as described herein, and have resulted, and will result, in damages to Plaintiff and the Class. These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations or omissions deceiving that the FS Subscriptions have characteristics, uses, and/or benefits, which they do  not, in violation of Cal. Civil Code §1770(a)(5); and (b) Defendant's acts and practices constitute  the advertisement of the goods in question without the intent to sell them as advertised, in violation  of Cal. Civil Code § 1770(a)(9).

100.     Plaintiff and the Class suffered economic injury as a direct result of Defendant's misrepresentations and/or omissions because they were induced to purchase FS Subscriptions

and/or pay renewal fees they would not have otherwise purchased and/or paid. Had Defendant fully and clearly disclosed the terms and purchase price associated with the FS Subscriptions, Plaintiffs and the  Class would have not subscribed to the FS Subscriptions, or they would have cancelled their  FS Subscriptions earlier, i.e., prior to the expiration of the initial subscription period.

102.    Plaintiff and the California Subclass members presently seek only injunctive relief under this Count. If Defendant fails to remedy the violations alleged herein within 30 days of receipt of Plaintiff's notice, Plaintiff will amend this Complaint to add claims damages pursuant to the CLRA.

<u>COUNT V</u>
**Unjust Enrichment / Restitution**

103.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

104.    Plaintiff brings this claim individually and on behalf of Class members under the laws of the State of California.

105.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

106.    Plaintiff and the Class conferred benefits on Defendant by purchasing the FS Subscriptions.

107.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Class's purchases of the FS Subscriptions. Retention of those moneys under these circumstances is unjust and inequitable because Defendant's failure to disclose material terms of the purchase agreement, in violation of California law, induced Plaintiffs and the Class to purchase the FS Subscriptions. These omissions caused injuries to Plaintiffs and the Class because they would not have purchased the FS Subscriptions at all, or on the same terms if the true facts were known.

108.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: August 29, 2022            Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:     */s/ L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

Joseph I. Marchese (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)

New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: jmarchese@bursor.com
          aleslie@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice* forthcoming)
630 Fifth Avenue, Suite 2000
New York, NY 10111
Telephone: (212) 884-4230
Facsimile:  (212) 884-4230
E-Mail: adrian@gr-firm.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff in this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the transaction alleged in the Complaint occurred in Sonoma County.  Plaintiff Young alleges he purchased the FS Subscription in this County.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California, this 29th day of August, 2022.

    /s/ L. Timothy Fisher
                      L. Timothy Fisher